IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | No. 1:14-cr-217 |
| | : | |
| EPHREN TAYLOR, II AND | : | |
| WENDY CONNOR | : | |
| | : | |

## <u>DEFENDANT WENDY CONNOR'S MEMORANDUM IN AID OF SENTENCING</u>

## I.    INTRODUCTION

Wendy Connor, through her counsel, hereby respectfully submits this Memorandum to assist this Honorable Court in the exercise of its discretion when imposing sentence upon her after her plea of guilty to one count of  Interstate Transportation of Money Taken by Fraud in violation of  18 U.S.C. §§2314 & 2. (This offense is a Class C felony because of 18 U. S. C. § 3559, which provides that an offense with a ten-year maximum is a Class C felony).  The statutory sentencing range is from zero month incarceration (which may include <u>full probation</u> since it is not a Class A or B felony) to a maximum of ten years incarceration.

1

With all due respect and humility, Mrs. Connor submits her Sentencing Memorandum to this Honorable Court and requests a below Guidelines sentence, and suggest a sentence of a year and a day incarceration followed by an extended period of supervised release.  Such a sentence is "reasonable" as reasoned based on the following arguments:

Mrs. Connor submits this memorandum to assist the Court in determining a sentence that is "sufficient, but not greater than necessary" under Title 18, United States Code, Section 3553(a).

## II.   INITIAL GUIDELINE DETERMINATIONS

The Presentence Report (PSR) calculates Mrs. Connor's Sentencing Guidelines at a Total Offense Level 36; Government objects to the Probation Officer's calculation of the Base Offense Level, taking the position that the offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization.  In the plea agreement entered on October 8, 2014, both the Government and Mrs. Connor stipulated to: (1) a Base Offense Level 6 under Guideline §2B1.1 because the statutory maximum is less than 20 years; (2) a level 18 added (loss of more than $2,500,000.00 but less than $7,000,000.00); (3) 6 level increase for the offense involving more than 250 victims and (3) a level 2 added for sophisticated means;

2

(4) level 4 added for  specific violation of Section 15(d) of the SEC Act of 1934; (5) level 3 added for being a manager or supervisor of a criminal activity that involved five or more participants; (6) 3 level downward adjustment for acceptance of responsibility pursuant to USSG §3E1.1(a) and (b).  Based on the stipulations in the plea agreement, the parties calculated a Total Offense Level 36.

Mrs. Connor's criminal history score is 0.  According to the sentencing table in USSG Chapter 5, Part A, Mrs. Connor's criminal history score of 0 establishes a criminal history category of I.  Mrs. Connor was allowed to plead guilty to a count that kept her maximum penalty to 10 years and the Government agreed to move for a downward variance such that Mrs. Connor's recommended sentence would be 84 months or 7 years.  This establishes the "initial benchmark" for sentencing under *United States v. Gall,* 552 U.S. 38, 49 (2007).   Nonetheless, the advisory Guidelines range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary." *See Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (quoting § 3553(a)).

We do not excuse the seriousness of Mrs. Connor's actions or the seriousness of the offense.  However, as will be discussed herein, the low-end of the correct Guidelines range – a sentence of a year and a month and probation and

scheduled restitution, with any other conditions this Court deems appropriate—is no greater punishment than necessary to serve the sentencing's ends.

## III.   SENTENCING PROCEDURE

In *United States v. Gall,* 552 U.S. 38, 49 (2007), the Supreme Court stated that a district court "may not presume that the Guideline range is reasonable," but rather "must make an individualized assessment based on the facts presented." The advisory Guideline range is but one factor to be considered in determining a sentence that is "sufficient, but not greater than necessary." See *Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (quoting §3553(a)).  Furthermore, the Court rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range *Gall at* 47.  Ultimately, the Court rejected rigid mathematical formulas to determine whether a variance from the Guidelines' sentence range is justified. *Id.*

Therefore, after calculating the proper offense level under the Guidelines and giving the government and the defendant the opportunity to argue for a sentence they believe to be appropriate, the district judge must consider each of the §3553(a) factors and "tailor the sentence" to fit the circumstances of the case. *United States v. Booker,* 543 U.S. 220, 245 (2005).  Section 3553(a) factors to be considered when imposing a sentence are:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the purpose of sentencing;

(3)    the kinds of sentence available;

(4)    the Sentencing Guidelines;

(5)    the policy statements issued by the Sentencing commission;

(6)    the need to avoid unwarranted sentence disparities among similar offenders; and

(7)    the need to provide restitution to any victims of the offense.

Essentially, the gist of Booker is that "[t]he court must then impose a reasonable sentence in light of the factors enumerated in 18 U.S.C. §3553(a)." *U.S. v. McBride,* 511 F.3d 1293, 1297 (11th Cir. 2007). Furthermore, "a district court need not account for every § 3553(a) factor, nor must it discuss each factor and the role that it played in sentencing." *Id.*

## IV.    NATURE OF THE OFFENSE

Mrs. Connor was charged by Information with Interstate Transportation of Money Taken by Fraud in violations of 18 U.S.C. §2314 and pled guilty to One Count. Mrs. Connor stands by her plea:  she acknowledges her guilt, and nothing in this section is intended to diminish the wrongfulness of what she did.  In

addition to this memorandum, Mrs. Connor has submitted a letter to express her remorse and desire to right the wrongs she committed. (See Exhibit A).

In the plea agreement, Mrs. Connor and the Government stipulated to the loss amount greater than $2,500,000.00 but less than $7,000,000.00, as well as agreeing to pay full restitution.  Mrs. Connor has accepted responsibility for all of the conduct and loss charged in the indictment.  In addition to pleading guilty in this case, Mrs. Connor has offered a Proffer to the Government giving a chronology of her involvements and the relevant events as well as giving a seven hour deposition with representatives from the Security and Exchange Commission concerning the events regarding the transactions that were in violations of the Indictment that she was initially charged with committing.  Moreover, Mrs. Connor, through the legal services of Attorney James Williams of Durham, North Carolina, contacted the local office of the Securities and Exchange Commission informing them of the possibilities of improprieties prior to any criminal actions taken by the Government against her.  Further, without any governmental request, Mrs. Connor provided the SEC with numerous boxes of records of the transactions of her former employer.

## V.    HISTORY AND CHARACTERISTICS OF MRS. CONNOR AND FAMILY TIES

Mrs. Connor is a 45 years old; a wife of almost ten years in her current marriage; a mother of four children ages 26, 20, 18 and 12; and a grandmother of 36 month old twins, all of which reside with Mrs. Connor. She was raised in a poverty infested community and was sexually abused at the age of 5 by her stepfather contracting a venereal disease as a result of that child molestation.  As a result of the rape, she moved in with and was raised by her maternal grandmother along with four siblings in a three bedroom apartment.  At the age of 5 and shortly after her rape, Mrs. Connor's mother who was subsequently diagnosed as a bipolar alcoholic abandoned her and left with her stepfather (the same adult who raped and molested her) and was not seen by Mrs. Connor until reaching the age of 10.  Her grandmother was illiterate but as a devout Christian was able with determination and perseverance to have Mrs. Connor reading the entire Bible by the age of 6.

As a result of these hardships and many others Mrs. Connor developed a strong religious faith at an early age, and understands the importance of treating people as she would have them treat her.  Her mission became to be an advocate of those who were mistreated, and to contribute in ending the cycle of poverty in her family and community by practicing the ethics of hard work and to assist other

young black females to overcome their own personal adversities and self esteem issues.

In 1986, after being faced with the decision to work full-time to help provide for her grandmother and siblings, Mrs. Connor dropped out of high school and obtained her GED through Wake Technical Community College located in Raleigh, North Carolina.  She actually began contributing financially to her entire family at the age of 13, when she was accepted into CETA (Comprehensive Employment and Training Act), a jobs program for low income households that taught under-privileged youth professional skills and on-the-job-training while earning a wage at a service oriented work-site. Mrs. Connor worked for the Army Processing Station.   It was through her experience at the Comprehensive Employment and Training Act ("CETA") that she learned the proper skills to interact professionally in the workplace, and gained social and customer service skills.

From the mid 1980's to the early 1990's Mrs. Connor served in management capacities for various retail store establishments. Her true professional career course began in 1994 when she started working in the Call Center Industry, serving the needs of various clients of GTE, Wells Fargo, RBC, Centura Bank, Mellon Bank, Red Hat Software, AT&T Wireless, Time Warner Cable, Varsitybooks.com

and the Employment Training Administration-Office of Job Corps. She would go on to participate in numerous professional development courses, certifications and seminars including Human Resources and Personnel management, seminars for business executives, programs on government contracts, project management, the structuring of Call Centers and the organizations development and design of sales and marketing strategies.

In 1994, Mrs. Connor began her call center career working for Zacson Corporation located in Morrisville, North Carolina performing in the role of a commissioned telesales agent. This position was a launching pad through dedication and hard work which allowed her to be promoted from the ranks of Sales Trainer to Training Manager, then Human Resources Manager, and on to Operations Manager.

Research and Evaluation Associates, Inc., a government contracting firm, hired Mrs. Connor in the role of Director of Outreach and Information Services. She was employed in this role from 2000-2003 at which time she was given a promotion to Vice President of Operations from 2003-2008. Research and Evaluation Associates was subsequently purchased by McNeil technologies and lost its North Carolina contract as Job Corps National Call Center, closed its offices and left Mrs. Connor unemployed.

As a result of her employer closing its operations, Mrs. Connor made the decision to own and operate her own call center and established a company known as Information Enterprises Unlimited (IEU) with her husband.

It was the call center expertise that Mrs. Connor acquired that led her to being introduced to the defendant, Ephren Taylor, in early 2009 which led to a consulting arrangement and subsequently an offer to become Chief Operation Officer for City Capital Corporation.

In December 2008, Mrs. Connor met two of the three authors of the book entitled the 3 CEOs, Mr. Floyd Williams and Mr. Spencer Iverson.  This introduction took place at a networking event for a multi-level marketing company known as "Your Travel Business" (YTB Travel).  Both Mr. Williams and Mr. Iverson approached Mrs. Connor and indicated their need to have a call center for a new business that they had recently launched known as "The Millionaire Lifestyle Institute".  They indicated their desire to launch a call center sales and marketing pilot to attract new members to the Millionaire Lifestyle Institute ("MLI"), described as a paid membership site which would allow members to "have access to mentorship to three successful millionaires and their network of mentors".  The following week, Mrs. Connor met with Mr. Williams at his home in Atlanta and

requested her to submit a proposal that they would in turn submit to their "third partner" who was identified as co-defendant Ephren Taylor who Mrs. Connor did not know, and had never heard of.  Mrs. Connor provided her proposal and was subsequently given notification from Mr. Williams and Mr. Iverson that Ephren Taylor had "granted them permission to contract her call center to perform outbound marketing calls to gain and increase new members for MLI".

In mid January 2009, still not having met or being introduced to defendant Ephren Taylor Mrs. Connor's call center performed a 1,000 pilot calls to create interest from perspective members of MLI.

Several weeks later, Mrs. Connor was invited to meet co-defendant Taylor at his Brier Creek North Carolina office.  Present at this meeting Mrs. Connor was introduced to Anthony Hall, Mekeda Pride, Chris Lewis, Kinetra Dixon and Kinte Dixon.  She was told by co-defendant Taylor at this first face to face meeting that there were several other staff members in New York, Missouri, and Ohio.  The "pitch" of Mr. Taylor at this meeting was that he expressed a "real passion to help people revitalize underserved communities and showing 'our people' especially Christians how to gain access to wealth through owning their own businesses while giving back to and employing people within the communities they reside."  At this meeting co-defendant Taylor indicated that he built his business in several years

using this philosophy and now was ready to "take his business to the next level." It was the opinion as expressed by co-defendant Taylor that Mrs. Connor's assistance in the call center would allow him the ability to reach a larger audience which would allow him to "help even more people."

Both Mrs. Connor and co-defendant Taylor met the next afternoon to discuss marketing initiatives that defendant Taylor wanted Mrs. Connor and her company to assist him with. During this second meeting defendant Taylor indicated that he needed assistance with coordinating an event known as "Women Empowerment" and that his right hand person, Anthony Hall, had set up the promotion. Taylor stated that he would pay Mrs. Connor a fee of 10-15% and as much as 20% depending upon volume of potential new members. During this second meeting Taylor indicated that his company had helped his clients grow their retirement through "socially conscious investments." He indicated that his company and his clients owned several different businesses such as petroleum, real estate, laundry services, cold stone creamery, juice companies, and that he was always looking for new businesses to invest in on behalf of his clients. Mr. Taylor told Mrs. Connor his affiliates that brought clients to him and his top affiliates were making as much as One Million Dollars per year for referrals they sent him and it was his opinion

that Mrs. Connor's call center could provide "leads" to "capture service" and he would pay her call center 10-15% of all leads that resulted in "closed deals."

Mrs. Connor agreed to assist in the Women Empowerment event and asked for a copy of the "affiliate agreement." She was also asked to be a guest speaker at an upcoming conference in Florida, known as "The Financial Lifeline Summit" that was hosted by Floyd Williams, Spencer Iverson and defendant Ephren Taylor. The Financial Lifeline Summit was held on March 3, 2009 and Mrs. Connor served as a female speaker. The Summit had a faith-based format where entrepreneurs provided training, motivation, mentorship, and guidance to first time business owners. During this Summit Mrs. Connor specifically asked Mr. Floyd Williams about his thoughts and assessment of defendant Taylor, and Mr. Williams indicated to Mrs. Connor that "Ephren is the 'real deal'". According to Mr. Williams he stated that he "believed in Ephren so much that he invested Fifty Thousand Dollars ($50,000.00) of his own funds."

On March 14, 2009 Mrs. Connor participated in the Women's Empowerment event. She set up the Millionaire Lifestyle Institute and City Capital Corporation booth, developed and distributed marketing materials, handled book sales, collected leads of individuals interested in meeting with defendant Taylor and his team about business and investment opportunities, and introduced

the members of Millionaire Lifestyle Institute during a private seminar.  Mrs. Connor's call center company generated a few hundred book sales and 159 individuals requesting one-on-one discussions with defendant Taylor.  At the summit defendant Taylor introduced Mr. Anthony Hall as his right hand person and lead closer, Mr. Chris Lewis as his sales consultant, and Ms. Mekeda Pride as sales consultant.  He described at this summit that the other members of his administrative team were in Raleigh and they were Mr. Kinte Dixon and Mrs. Kinetra Dixon.

On March 16, 2009, defendant Taylor contacted Mrs. Connor and informed her that he was interested in purchasing her call center company.  During this same conversation in which defendant Taylor offered to purchase Mrs. Connor's company defendant Taylor also told Mrs. Connor that she should go to YouTube where there were videos of him on "The Big Idea-Donnie Deustche and Montel Williams".  He also stated that he was scheduled to appear on the Oprah Winfrey Show but was "bumped by the Olsen twins."  He also told her that he spoke at the Democratic National Convention and was being referred to as the "next Obama." He instructed Mrs. Connor to go online to see him giving donations which he described as "Big" checks to people like syndicated radio personality Tom Joyner and recording artist "Snoop Dog".

Mr. Anthony Hall explained the business that they operated in the following manner:

> "At City Capital Corporation we teach clients how to invest their retirement accounts into companies that they own instead of the stock market owning them.  The clients invest into City Capital's companies such as our gas stations, laundry mats, ice creamery, drop off stores, real estate and that defendant Taylor is constantly looking for new companies."

In the latter part of March 2009 Mrs. Connor was contacted by Mr. Anthony Hall and asked to meet with him.  At that meeting Mr. Hall stated that he had some concerns with how defendant Taylor was "doing things" and wanted to let Mrs. Connor know "before she sent more customer referrals to defendant Taylor".  Mr. Hall informed Mrs. Connor that he and two other employees were planning to start their own business doing the same thing that defendant Taylor was doing.  Hall indicated that he had "all of Taylor client files" and he was the one "selling mostly to all the customers."  When asked for specific improprieties, Hall indicated that "there is nothing inappropriate at the time, but based on the way defendant Taylor was operating he (Hall) felt that some improprieties could happen in the future."

The next day, Mrs. Connor and her husband informed defendant Taylor of their meeting with Anthony Hall and Hall's representation of the questionable manner in which defendant Taylor was handling investors' funds.  Defendant

Taylor's explanation was that Hall was only envious and upset because he (Hall) felt that he was entitled to a greater commission payment.

It was during this discussion that defendant Taylor indicated that the only problem with his company is that it needed more structure and the assistance of Mrs. Connor and offered her the position of Chief Operating Officer at a salary of $200,000.00 with a $50,000.00 bonus plus a 20% shares of stock, plus commission, plus broker fees on business deals closed directly by Mrs. Connor plus all call center expenses paid by Taylor's company.

Mrs. Connor informed defendant Taylor that she had "plenty of private sector experience, but that she had no publicly traded experience". Defendant Taylor indicated that the lack of Mrs. Connor's experience was not important and that "he would handle everything related to the operation of the public company as it related to filings and compliance". Defendant Taylor stated that "he already had the full operation of the business going and needed Mrs. Connor to help with the structure for the operations and marketing". Defendant Taylor responded to Mrs. Connor and told her "it was too complicated to worry about and it would take her 'forever' to learn." Defendant Taylor indicated that he was referring everything to Lynda Keeton of Keeton & Associates, a law firm out of Nevada. Mrs. Connor

subsequently visited the Keeton firm with then current Chief Operating Officer, Melissa Grimes.

Defendant Taylor indicated that he had a board consisting of Mr. Don McMarthy who lived in the Caribbean and Mr. Emerson Brantley who was his mentor.

The immediate working arrangement with defendant following this conversation was that Mrs. Connor would begin as a consultant and she and defendant Taylor would work on a formal agreement for her to serve as Chief Operating Officer as earlier described. Melissa Grimes, the then current Chief Operating Officer, was going to work part-time because she was going to attend law school. Mrs. Connor's consultant fee would be $10,000.00 and her call center staff would be paid $12.00 per hour plus commissions.

Defendant Taylor never signed the employment agreement that he earlier indicated that he would execute. Rather than executing the employment agreement drafted by Attorney Laura Westch, defendant Taylor stated that his attorney advised him to sign a more "simple agreement" because of "time constraints." On November 2009 defendant Taylor executed the "simple employment agreement." In addition defendant Taylor directed Phyllis Orth, the current Comptroller, to issue 300,000 shares of stock to Mrs. Connor. Defendant Taylor also instructed

Mrs. Orth to provide Mrs. Connor a W-9 tax form for the value of the stock on the day of its issuance with an unjustified and unconfirmed value of $469,000.00.

In and around April 2009 the board members in a conference call expressed their concerns to defendant Taylor of the lack of experience and education of Mrs. Connor to act in the role of the Chief Operating Officer.  It was later learned by Mrs. Connor that defendant Taylor terminated the two board members. Defendant Connor was employed by the company of co-defendant Taylor for less than 10 months.  It should be noted that at the commencement of employment, defendant Connor had no criminal intent or knowledge of any criminal activity committed by defendant Taylor and or others in his company.  In fact, she had been assured by other executives that defendant Taylor "was for real". The criminal enterprise of Taylor had been created, executed and carried out by Taylor and the previously mentioned un-indicted executives and sales force, prior to defendant Connor being offered the position of Chief Operating Officer, a position held previously by another un-indicted executive officer.  Finally, most of the victims of this criminal operation were victimized prior to defendant Connor's employment.

## VI.   GROUNDS FOR DEPARTURE UNDER 18 U.S.C. § 3553 (a)

Near the end of the Civil War, Abraham Lincoln was asked by his friend, Illinois Judge Joseph Gillespie, "what would be done with the rebels." *Mr. Lincoln*

*on Mercy,* N.Y. Times, Feb. 23, 1876, (reprinting a letter to the St. Louis Republican by Hon. J. Gillespie, Feb. 7, 1876). He pointed to the example set by King David who, after being cursed and attacked by Shimei, mercifully granted him a pardon despite others' pleas for Shimei's beheading. *Id.* (citing 2 Samuel 19:16-24). Later in conversation with Judge Gillespie, President Lincoln was asked what he would do with the Union's deserters. *Id.* He famously replied: "I can't tell you; but I will say this, that I have always found that mercy bears richer fruits than strict justice." *Id.* It is in the spirit of President Lincoln, King David's pardon, and the factors enumerated in 18 U.S.C. § 3553 (a) that Mrs. Connor asks for a merciful sentence.

Mrs. Connor's difficult childhood and tumultuous life warrant a downward departure from the agreed upon departure recommendation of the Government. Under 18 U.S.C. § 3553 (a)(1), the Court must consider "the history and characteristics of the defendant" when determining the appropriate sentence. *United States v. Samuels,* 2009 WL 875320, 4 (S.D.N.Y., 2009). In *Samuels,* the defendant faced a Guideline range of 70-97 months for selling crack cocaine. *Id.* The Court reduced the defendant's sentence to time served (15 months) and a three-year term of supervised release because she was raised by a poor, drug addicted father, and was a high school dropout. *Id.* At 4. In the case at bar, Mrs.

Connor spent the first twelve years of her life being traumatized by an alcoholic mother, and abusive step-father regularly fending off sexual abuses and domestic violence. By 18 Mrs. Connor was a mother and trying to make a life for herself and her newborn. Effectively, Mrs. Connor was robbed of a peaceful, stable childhood. Without ever receiving the benefit of counseling to cope with the abuse and trauma she experienced, she then married a man who was also abusive and who left her for another woman. Until her current marriage, Mrs. Connor's relationship with men has always been exploitive and unhealthy; because this is the paradigm under which she spent the most formative years of her life.

Good works are not a ticket to heaven or a reduction of sentence under the guidelines *per se.* However, such matters are now a valid consideration under 18 U.S.C. § 3553(a). There are no limitations on the information the Court may consider at sentencing "concerning the background, character and conduct of a person who pleads guilty to an offense." 18 U.S.C.§ 3661. As part of its consideration of these factors, the court must recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582 (a).

The important message sent by the suggested sentence here can be accomplished not as much by the length of incarceration as by the fact of

incarceration itself.   This Court is well aware 18 U.S.C. § 3553(a) begins by stating, "The Court shall impose a sentence sufficient, but not greater than necessary" to meet the goals of sentencing established by Congress. *Kimbrough v. United States,* 128 S.Ct. 558, 570 (2007).   The statue, in addition to requiring the sentencing court to consider the "nature and circumstance of the offense", also requires the court to consider the "history and characteristics of the defendant." The general purposes of the Sentencing Reform Act, is to consider the kinds of sentences available, the need to avoid unwarranted sentencing disparities, and to provide restitution.   The unique penalty suffered by the parent of children when that parent is the main provider of the family unit as is the case with defendant Connor does present a hardship that will be suffered by the children and family.

Mrs. Connor knows the Court will and should consider the magnitude of this offense, but she is hopeful that the Court will also consider the unique hardship upon a father, children and grandchildren all of which Mrs. Connor is the main provider, upon being incarcerated and, most importantly, the effect her incarceration will have upon her family. This particular circumstance falls within the category deserving of the Court's considerable weight.   The Sentencing Commission's policy statement §5H1.6 directs the Court to consider whether (1) the defendant's sentence will "cause a substantial, direct and specific loss of the

essential caretaking or essential family support, to the defendant's family; (2) The loss of caretaking or financial support substantially exceeds the ordinarily incident to incarceration for a similarly situated defendant; (3) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonable are available making the defendant's caretaking or financial support irreplaceable to the defendant's family; and (5) The departure effectively will address the loss of caretaking or financial support.

Although a district judge "should begin all sentencing proceedings by correctly calculating the applicable Guidelines ranges," *Gall,* 128 S.Ct. at 596, the advisory Guidelines are only one of the factors to be considered in imposing a sentence. *Id.* At 602. Indeed, the district court may not presume the Guidelines range is reasonable, and it must make an individualized evaluation of the facts and circumstances before it. In doing so, the sentencing court should consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals set forth in § 3553(a), but that such a sentence would be "greater than necessary"— put differently, that a Guidelines sentence will actually thwart the application of § 3553(a)'s command to impose the minimum sentence necessary to achieve the goals of sentencing. *Rita v. United States,* 127 S.Ct. 2456, 2465 (2007). The court is "free to make its own reasonable application of the § 3553(a)

factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough,* 128 S.Ct. at 577 (Scalia, J., concurring).   Indeed, based on its evaluation of all the § 3553(a) factors, the court may elect to impose a non-Guidelines sentence – including a sentence substantially deviating from the advisory Guidelines range - "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough,* 128 S. Ct. at 570.  Among other reasons, such a disagreement may be based upon the court's conclusion that a particular Guidelines analysis reflects an unsound judgment (or no considered judgment at all) by the Sentencing Commission. *Id. Gall.* 128 S. Ct. at 594.  The ultimate task before this Court is to fashion a reasonable sentence based on the advisory Guidelines, the § 3553(a) factors and application of this Court's considerable discretion. *Kimbrough,* 128 S. Ct. at 576.  Just as the Court is to "consider every convicted person as an individual", so too must the Court evaluate "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall* 128 S. Ct. 598 (quoting *Koon v. United States,* 518 U.S. 81, 113 (1996).

The Court, following *United States v. Booker,* and more recently, *Gall v. States,* must give due consideration to all the factors set forth in 18 U.S.C. § 3553. The statue mandates imposition of a sentence that is "sufficient, but not greater

than necessary" to comply with the purposes enumerated in its subsections, including deterrence, protecting the public, and promoting respect of the law.

## VII.   COLLATERAL CONSEQUENCES FULFILL MOST PURPOSES OF SENTENCING

As former President Bush recognized when he commuted Lewis Libby's perjury and obstruction sentence (from 30 months to probation), "the consequences of his felony conviction…will be "long-lasting and harsh". *See White House office of the Press Secretary, Statement by the President on Executive Clemency of Lewis Libby,"* July 2, 2007 (http://georgewbush-whitehouse.archives.gov/news/releases/2007/07/20070702-3.html) (regarding *United States v. Libby,* Dist. Ct. No. 1:05CR-00394-RBW-1 (D. D. C. 2007).

## VIII.  UNLIKELIHOOD OF RECIDIVISM

According to the United States Sentencing Commission in its 2004 publication entitled Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, the factors of age, gender, employment status, criminal history, and illicit drugs use comprise the primary predictors of recidivism.  As stated previously, Mrs. Connor is 46 years of age.  Obviously, she is a female.  She has a criminal history level of 1.  She is currently employed with

Tier 1 Solar as a business analyst.  Lastly, she has never consumed an illicit drug in her life.  According to the Sentencing Commission study "that first offenders are less culpable than other offenders" US.S.C., "recidivism and the First Offender," at 9 (Released 2, May 2004), it found that "sentencing reductions for 'first offenders' are supported by the recidivism data and would recognize their lower re-offending rates". U.S.S.G., "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," at page 15 (hereinafter, "Criminal History Computation") (Release 1, May 2004).  Congress has also recognized "the general appropriateness of imposing a sentence other than imprisonment" for first-offenders not convicted of violence or similarly serious offenses. 28 U.S.S.G.§ 994(j); accord, "Recidivism and the First Offender," at 3.

The Sentencing Commission has determined that criminal history point's better forecast the risks of re-offense than the Criminal History Category. U.S.S.G., "Criminal History Computation," at 7.  Offenders like Mrs. Connor with zero criminal history point's recidivate just 11.7% of the time.  See, "Recidivism and the First Offender," at 13-14.   Women are less likely to re-offend than men. Gainfully employed defendants only have a 19.6% rate of recidivism. Further, "[r]ecidivism rates decline relatively consistently as age increase," from 35.5% of offenders under age 21 to 12.7% over age 40.  U.S.S.G., "Criminal History

Computation," at 12 and 28, Exh. 9 (showing recidivism rates of just 6.9% for offenders, like Wendy Connor, aged between 40 and 50 and in Criminal History Category I).  Finally, those who abstain from illegal drugs are far less likely to re-offend than those who consume.  Non-drug users have a 17.6% recidivism rate. Mrs. Connor is an unlikely recidivist.

## IX.    COOPERATION WITH GOVERNMENT

Mrs. Connor has fully and completely cooperated with the government including providing the SEC with unrequested boxes of documents, being deposed for seven hours, provided a detailed proffer and provided a phone interview with the SEC to answer all questions of all organizations and individuals involved in this criminal activity even after entering her guilty plea.  She has more than demonstrated her desire to correct a wrong for which she has genuinely and totally accepted responsibility.

## X.    REQUESTED SENTENCE AND CONCLUSION

Mrs. Connor has committed a serious offense and accepts responsibility for her actions.  The 36-level increase in Mrs. Connor's guideline range pursuant to U.S.S.G. §2B1.1 results in a sentence that is disproportionately harsh and she respectfully asks the Court to take all of the circumstance of her case into account.

The Government has agreed in the Plea Agreement to recommend a downward variance of 84 months.   It is our view that a sentence of 13 months of imprisonment followed by 5 years of supervised release, with a restitution schedule and such other conditions as the Court would deem appropriate would be "sufficient, but greater than necessary" to fulfill the goals of sentencing established by Congress.   We recognize that respect for the law, just punishment, and deterrence demand supervision and some incarceration.   But, too harsh a sentence fails to respect the law just as much as too lenient a sentence. (See Justice Anthony Kennedy's Testimony before the Senate Judiciary Committee, February 14, 2007.) ("Our sentences are too long, our sentences are too severe, our sentences are too harsh...there's no compassion in the system.   There's no mercy in the system."). It is Mrs. Connor's sincere hope that the Court will consider circumstance beyond what is enhanced by an economic determination and sophisticated means under U.S.S.G. § 2B1.1 and specifically see the unique punishment suffered by parents who are separated from their family and children, the hardship that her children and grandchildren will suffer, and her willingness to cooperate with the Government.   Her honesty and acceptance of responsibility and her desire to be allowed to demonstrate to the court, and this community, that she will have a life to rectify all of her bad judgments and wrongs that has been sustained. Ultimately,

her only request is for the Court to make a reasoned decision in accord with the requirement of 18 U.S.C. § 3553(a), and while considering the great economic harm suffered by the victims, temper the passion of those harmed with the rule of law.

Dated: March 10, 2015            Respectfully submitted,
Daniel R. Meachum & Associates, LLC


BY: /s/ Daniel R. Meachum
Georgia Bar No. 500055
Attorney for Defendant Wendy Connor

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA   |

vs.   |

  |      Case No. 1:14CR-217

  |

EPHREN TAYLOR, II AND   |
WENDY CONNOR   |

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing Defendant's Memorandum in Aid of Sentencing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Chris Huber, Assistant US Attorney

Christopher Bruno, Counsel for Ephren Taylor, II

Linda S. Sheffield, Counsel for Ephren Taylor, II

This 10th day of March, 2015.

Respectfully submitted,
DANIEL R. MEACHUM & ASSOCIATES, LLC

/s/ Daniel R. Meachum
Daniel R. Meachum
Georgia Bar No. 500055